[Cite as *In re A.J.*, 2016-Ohio-7979.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE:   A.J., K.J., C.J. and M.J.    :
          :
          :     C.A. CASE NO. 27137
          :
          :     T.C. NOS. 2013-1914, 2013-1915,
          :     2013-1916, 2013-1917
          :
          :     (Civil appeal from Common Pleas
          :      Court, Juvenile Division)
          :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___30th___ day of _____November_____, 2016.

. . . . . . . . . .

HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, 301 W. Third Street, 5th floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

KIRSTEN KNIGHT, Atty. Reg. No. 0080433, P. O. Box 137, Germantown, Ohio 45327
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

**{¶ 1}** Petitioner-appellant Father appeals a decision of the Montgomery County Court of Common Pleas, Juvenile Division, terminating his parental rights with respect to four of his minor children, A.J., K.J., C.J., and M.J. (hereinafter referred to as "the Children"), and awarding permanent custody of all of the Children to Montgomery County Children's Services (hereinafter "MCCS"). Father filed a timely notice of appeal with this

Court on June 1, 2016.[1]

{¶ 2} A.J. was born in April of 2007. K.J. was born in September of 2009. C.J. was born in April of 2010. M.J. was born in March of 2011. Father is the biological father of A.J., K.J., and C.J., but not M.J. Father, however, is listed as the legal father and guardian of all the Children.

{¶ 3} MCCS became involved with the Children in March of 2013, after Mother gave birth to a baby who tested positive for illegal drugs. The record indicates that this was the second child that Mother had given birth to who tested positive for drugs. Mother also tested positive for drugs at the time of the child's birth. In a separate case, Mother and Father's parental rights were terminated with respect to the infant born in March of 2013. We also note that in February of 2013, Father was arrested for possession of marijuana and pills without a prescription.

{¶ 4} Thereafter, on March 18, 2013, MCCS filed a complaint in which it alleged that the Children were dependent because of Mother and Father's drug abuse and the parents' inability to provide basic necessities for them. On March 25, 2013, the juvenile court awarded interim custody of the Children to MCCS. The Children were adjudicated dependent on April 23, 2013. MCCS was awarded temporary custody of the Children on July 24, 2013.

{¶ 5} In the early pendency of the case, MCCS created a case plan for Mother and Father whereby they could address the issues leading to the removal of the Children from

---

[1] We note that although Mother's parental rights regarding all of the Children were also terminated along with Father's rights, Mother did not appeal the juvenile court's decision. Therefore, on appeal, we need only address the merits of the juvenile court's decision as it relates to Father.

their care. The case plan for Father included a drug assessment and follow up treatment, an order to obtain and maintain stable housing and employment, and complete parenting classes, as well as to attend the Children's various appointments.

{¶ 6} On May 27, 2014, the juvenile court granted MCCS the first extension of temporary custody of the Children. Shortly thereafter, on September 12, 2014, MCCS filed a motion for permanent custody of the Children. Mother filed a motion for a second extension of temporary custody of the Children on December 8, 2014. On January 16, 2015, Father filed a motion for custody of the Children, or in the alternative, for a second extension of temporary custody to MCCS.

{¶ 7} On January 23, 2015, a hearing was held before the magistrate regarding MCCS's motion for permanent custody, during which the trial court heard testimony from several witnesses, including Mother, MCCS caseworker Kathy Hatton, and the Children's foster mother. The hearing was continued until April 2, 2015, at which time the magistrate heard additional testimony regarding the motion for permanent custody of the Children as well as the MCCS's recent motion to suspend Father's visitation. Mother was not present at the continued hearing because she was incarcerated. Father was present at the hearing but did not testify. The magistrate heard testimony from the Children's therapists and caseworkers from MCCS. Father's sister and grandmother also testified on his behalf.

{¶ 8} On July 27, 2015, the magistrate issued a decision terminating Mother and Father's parental rights and granting permanent custody of the Children to MCCS. Represented by separate counsel, Mother and Father filed objections to the magistrate's decision on the same day, August 10, 2015. The juvenile court subsequently overruled

Mother and Father's objections and adopted the magistrate's decision in a judgment issued on April 25, 2014.

{¶ 9} It is from this judgment that Father now appeals.

{¶ 10} Father's sole assignment of error is as follows:

{¶ 11} "THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO MONTGOMERY COUNTY CHILDREN'S SERVICES BECAUSE THAT AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILD."

{¶ 12} In his sole assignment, Father contends that the juvenile court erred when it adopted the decision of the magistrate granting permanent custody of the Children to MCCS. Specifically, Father argues that the evidence adduced at the hearing established that he had completed "most" of his case plan objectives and he was sufficiently bonded with the Children.

{¶ 13} R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. *In re K.M.,* 8th Dist. Cuyahoga No. 98545, 2012–Ohio–6010, ¶ 8, citing R.C.

2151.414(B)(1).

{¶ 14} R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶ 15} Father does not dispute that at the time of the hearing, the Children had been in the temporary custody of the Agency for over twelve months of a consecutive twenty-two month period. The Children have resided together at the same foster placement since they were taken into the custody of MCCS in April of 2013. The evidence supports a finding that the Children are bonded with their foster family. The Children refer to their foster parents as "mom" and "dad," respectively. The evidence also established that the Children are adoptable, and that at the time of the hearing, the foster family expressed their desire to adopt all of the Children.

{¶ 16} Foster mother testified that after visits with Father, M.J. was noticeably quieter and started wetting the bed and spreading feces on the floor in the bathroom. Foster mother also testified that K.J. began calling her and her husband by their first names because Father told the Children not to call them "mom" and "dad." Foster

mother further testified that A.J. and K.J. reported to her that they were very upset because at a recent visit, Father had stated that he was going to kill the foster parents after the Children were released into his care. The Children indicated to Alicia Green, an MCCS caseworker, that they were scared of Father because he told them he was going to kill the foster parents as well as MCCS employees.

{¶ 17} Kevin Denzler, a licensed therapist employed by the National Youth Advocate Program, testified that he has counseled A.J. since August of 2013. Denzler testified that based on his interactions with A.J., he believes she may have past exposure to domestic violence in her biological parents' home and could be moderately traumatized as result. Denzler testified that A.J. stated that she and the other children were scared and anxious after a visit with Father in March of 2015 because he was yelling at the children for telling others about the way he acted during their visitation time at MCCS. A.J. told Denzler that she was concerned that if she and the other children were to be placed back with Father, their lives would not get better, but only get worse. Green testified that in March of 2015, there was an altercation between Father and a Sheriff's Deputy during which Father yelled profanities at the deputy and also called the Children's former MCCS supervisor derogatory names. The Children reported to Green that while they love Father and like to see him, they were scared of the way he acted and wanted the foster parents to be present with them during visitation. M.J. informed Green that essentially he believes he is treated badly because he is not Father's biological child. M.J. indicated that he wanted to live with his foster parents.

{¶ 18} Additionally, the record establishes that Father has an ongoing substance abuse problem that he has failed to properly address. In early 2013, Father tested

positive for drugs and was referred to CAM and completed the outpatient program. Thereafter, however, on December 18, 2014, at the beginning of a visitation with the Children, Father submitted to a drug screen which came back positive for cocaine, heroin, alcohol, and other unspecified opiates. Green testified that Father disputed the drug test results, stating that he only smoked cigarettes. Father claimed the drug test was incorrect. Father was referred to an assessment at CAM after the positive drug screen, but he never attended the assessment claiming that he was "too busy." Green also provided Father with a list of local adult in-patient and outpatient treatment providers, but he never contacted any of the local treatment facilities.

{¶ 19} The record also establishes that Father has failed to provide adequate housing for the Children. Specifically, Father began living with his parents after the Children were placed in the temporary custody of MCCS. MCCS supervisor Kathy Hatton testified that Father's parents' house did not have sufficient bed space for all of the Children. Sometime thereafter in September of 2014, former MCCS caseworker Michelle Smith testified that she did a home visit at Father's purported new residence where he stated he was living with his grandmother. Smith testified that it was apparent that Father was not actually living at the residence because the room he stated was "his" was filled what appeared to be his grandmother's personal items. Moreover, Smith testified that the grandmother's house did not contain sufficient bed space and bedding for all of the Children. Green further testified that at the time of the hearing, Father had failed to locate adequate, stable housing for the Children and himself.

{¶ 20} Furthermore, we note that all of the Children were involved in some type of therapy or counseling at the time of the permanent custody hearing. The record

establishes that Father never contacted any of the Children's therapists or counselors regarding their progress. A.J. and K.J. were both struggling at school when they were initially placed in foster care. A.J. and K.J. were therefore placed in special programs to help them succeed. Although he was told to contact the school regarding their progress, Father has never contacted A.J. and K.J.'s school. The record also establishes that Father has never contacted the Children's foster mother regarding any medical and/or dental appointments they have attended, nor has Father attended any such appointments. Father indicated to Green that he did not think that the Children needed to be involved with any special services if they were returned to his custody. Father further stated that the only reason the Children were receiving help was because MCCS was involved.

{¶ 21} Finally, the GAL indicated that the Children's best interests would be served by granting custody to MCCS. Father expresses the desire to retain custody of the Children, but he failed to comply with the terms of his case plan, which was designed to aid him in rectifying the problems that resulted in MCCS's intervention. Specifically, the record establishes that Father failed to maintain stable housing, and he has a significant, ongoing substance abuse problem that he failed to properly address. Moreover, his angry, erratic, and potentially violent behavior during visitation with the Children speaks to his questionable fitness as a caretaker and provider for the Children.

{¶ 22} A trial court's decision on termination "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted).

*In re A.U.,* 2d Dist. Montgomery No. 22264, 2008–Ohio–186, ¶ 15. Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *In re A.J.S.,* 2d Dist. Miami No. 2007 CA 2, 2007–Ohio–3433, ¶ 22. The "rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *In re J.Y.,* 2d Dist. Miami No. 07–CA–35, 2008–Ohio–3485, ¶ 33.

{¶ 23} Our review of the record, transcript, and exhibits establishes that there is clear and convincing evidence which supports the juvenile court's decision finding that the statutory elements for termination under R.C. 2151.414(B) have been satisfied. Thus, the juvenile court did not err when it adopted the decision of the magistrate awarding permanent custody of the Children to MCCS.

{¶ 24} Father's sole assignment of error is overruled.

{¶ 25} Father's sole assignment of error having been overruled, the judgment of the juvenile court is affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Heather N. Jans
Kirsten Knight
Andrew Schlueter
Julia Kolber
Hon. Anthony Capizzi